UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────

NICHOLAS MORGAN,

                Petitioner,        **No. 6:13-CV-6643(MAT)**
                                 **DECISION AND ORDER**

     -vs-

MARK BRADT, as the Superintendent of
Attica Correctional Facility, and
ERIC SCHNEIDERMAN, New York State
Attorney General,

                Respondents.

───────────────────────────

## I.   Introduction

     Represented by counsel, Nicholas Morgan ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, on the basis he is being unconstitutionally detained in Respondents' custody. Petitioner is incarcerated pursuant to a judgment entered on May 24, 2006, in New York State Supreme Court, Monroe County (Valentino, J.), following a jury verdict convicting him of Murder in the Second Degree (depraved indifference murder) (New York Penal Law "P.L." § 125.25(2)) and various weapons-possession and drug-possession charges.

## II. Factual Background and Procedural History

     Petitioner's conviction stems from an incident that occurred on the evening of September 28, 2005, on Bismark Terrace in the City of Rochester. That day, sixteen-year-old Miquesha Hazzard ("Hazzard") was visiting her fifteen-year-old boyfriend, Jamel

Wigington ("Jamel"), and his fourteen-year-old sister, Elizabeth Chung ("Chung"), at their home at 28 Bismark Terrace. Also at home were Jamel's brother, Michael Wigington ("Michael"), Chung's two pre-teen nieces, and Chung's mother's boyfriend, Wesley Arline ("Arline").

Petitioner's sister and co-defendant, Carrie Fulmore ("Fulmore") lived directly across the street at 31 Bismark Terrace with her teenaged daughters, Ashley Forte, Shana Forte, and Candice Forte.

During the summer of 2005, the teenaged residents of 31 Bismark Terrace and their friends had been feuding with the teenaged residents of 28 Bismark Terrace and their friends. At around 5:00 or 6:00 p.m., the animosities resumed when Ashley Forte's sixteen-year-old boyfriend, Jose Jimenez ("Jimenez"), asked Hazzard, "What the fuck are you looking at, you bitch?" T.859-63. After Hazzard and Chung related Jimenez's comment to Jamel and Michael, the brothers confronted Jimenez, who pulled up his shirt to display a handgun in his waistband. Saying, "Oh I be back, I be back," Jimenez walked away.

When Michael made a comment about Jimenez to Ashley Forte, an argument ensued between Fulmore and Michael which quickly escalated into a melee in the street. Fulmore and her three daughters were on one side, with the Wigington brothers, Chung, and Hazzard on the

other. Chung got hit in the head with a shovel by Fulmore and Fulmore was punched in the eye.

Eventually, Arline, who was inside the house at 28 Bismark Terrace, came out broke up the fight. As the participants were dispersing, a witness heard Fulmore say, "You all going to get it tonight." Minutes later, Chung observed Fulmore standing on her porch yelling into a cordless telephone. Chung presumed Fulmore was calling the police. Fulmore did call 911 at 6:45 p.m. and told the operator, "No we ain't fighting now, but ya'all need to come because they gonna get fucked up, I'm serious." T.1138-1139, 869-871, 1112-1113. At 6:51 p.m., however, Fulmore called the phone number registered to the address at which her father (Willie Morgan) and Petitioner resided. Arline could hear Fulmore on her cordless phone saying to someone, "Come over here and shoot up this motherfucking house." T.1601-1614, 1145. Within minutes of Fulmore's call to Willie Morgan's house, a man identified by two eye-witnesses (Chung and Brandon Parrish ("Parrish")) as Petitioner, arrived on the scene. The witnesses watched as Petitioner walked down Bismark Terrace on foot, holding a black handgun in his hand. Petitioner stopped in front of Fulmore's house and asked, "[W]hich house are you talking about?" Fulmore, who was standing in her front yard, pointed across the street and said, "That house right there." Petitioner raised the handgun he was carrying and fired at least twelve times at the house at

28 Bismarck Terrace. The shooting stopped when Arline grabbed his rifle and fired one shot out the front door of 28 Bismark Terrace toward the pavement. One of the multiple bullets fired into the house at 28 Bismark Terrace struck Hazzard in the chest, causing fatal injuries. T.873-881, 1035-1037, 1151-1154, 1647.

Parrish, a friend of Jimenez, Ashley Forte's boyfriend, was standing outside on Bismark Terrace during the shooting. Parrish witnessed Petitioner fire his gun at 28 Bismark Terrace and could hear the sound of a window breaking. After Petitioner fired the shots, Parrish saw him go back up the street in the same direction from which he had come.

The following day, the police arrested Petitioner at 113 Bernard Street, and found him in possession of marijuana and crack cocaine.[1] Fulmore's stepmother, Judy Morgan, resided at 113 Bernard Street and was married to Petitioner's father, Willie Morgan. According to statements by Judy Morgan and by Petitioner at the time of his arrest, Petitioner lived about a block away at 210 Bernard Street with his father, Willie Morgan, who "was bouncing back and forth between 210 and 113 Bernard," but spent most of the time at 113 Bernard Street.

Later that day, police conducted a search at 113 Bernard Street pursuant to a warrant and found a Taurus Luger 9mm

---

[1]

Fulmore also was arrested and charged with second-degree murder. Petitioner and Fulmore were tried at the same time but before separate juries.

semi-automatic handgun taped underneath a hutch in the dining room. At trial, a ballistics expert testified that the handgun seized by the police fired the casings and projectiles recovered by police at the crime scene. T.1316, 1384-86, 1402-16, 1425-28, 1648-85.

The jury returned a verdict convicting Petitioner of Murder in the Second Degree (P.L. § 125.25(2)), Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03(2)), Criminal Possession of a Weapon in the Third Degree (P.L. § 265.02(4)), Criminal Possession of a Controlled Substance in the Third Degree (P.L. § 220.16(1)), Criminal Possession of a Controlled Substance in the Fifth Degree (P.L. § 220.06(5)), and Unlawful Possession of Marijuana (P.L. § 221.05). Petitioner was sentenced as a second felony offender to an aggregate term of imprisonment of twenty-five years to life.

Represented by new counsel, Petitioner timely filed a notice of appeal in the Appellate Division, Fourth Department, of New York State Supreme Court. The direct appeal was held in abeyance pending the outcome of Petitioner's counseled motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 filed in Monroe County Supreme Court (Valentino, J.) ("the 440 Court") and asserting claims of ineffective assistance of trial counsel. The 440 Court denied the motion on the merits without a hearing on November 9, 2010, and the Appellate Division denied leave to appeal.

-5-

On June 8, 2012, the Appellate Division, Fourth Department, unanimously affirmed the judgment of conviction. People v. Morgan, 96 A.D.3d 1418 (4th Dep't 2012). On December 4, 2012, the New York Court of Appeals denied leave to appeal. People v. Morgan, 20 N.Y.3d 987 (2012).

In his timely habeas petition, Petitioner asserts that trial counsel was ineffective for failing to investigate and present a defense on the science of firearm and toolmark identification and that the multiple identification procedures employed by the police were unduly suggestive. Respondent answered the petition, and Petitioner filed a reply brief. For the reasons discussed below, the Court declines to issue a writ of habeas corpus and dismisses the petition.

## IV. Substantive Predicates to Habeas Relief

Under the amendments to the federal habeas statute contained in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, if a petition includes a claim that has been "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), the federal court may not grant relief unless that adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). AEDPA's standard is "difficult to meet," Harrington v. Richter, 562 U.S. ----, ----, 131 S.Ct. 770, 786 (2011), and "demands that

state-court decisions be given the benefit of the doubt," <u>Woodford</u>
<u>v. Visciotti</u>, 537 U.S. 19, 24 (2002) (<u>per</u> <u>curiam</u>) (citation and
internal quotation marks omitted).

## V.   Merits of the Petition

### A.   Ineffective Assistance of Counsel

Petitioner asserts, as he did in support of his C.P.L.
§ 440.10 motion and on direct appeal, that he was deprived of the
effective assistance of trial counsel because counsel did not
cross-examine the prosecution's ballistics expert regarding his
testimony that the gun found at Petitioner's stepmother's house was
the gun that fired the casings and projectiles found at the scene
of the crime, and failed to counsel failed to call a rebuttal
expert to counter the ballistics expert's conclusions. A brief
summary of the state court proceedings and ruling follows.

#### 1.   Background

At trial, the prosecution's firearms and toolmark
identification expert, John Clark ("Clark"), testified that it was
"possible to determine if a spent shell casing has been fired from
a particular semiautomatic handgun to the exclusion of all other
handguns[,]" T.1652; that he was able to conclude, in this case,
that "all 12 of the fired cartridge cases were fired in the Taurus
pistol to the exclusion of all other firearms[,]" T.1665; and that
it was "possible to determine if a particular spent bullet was
fired from a particular firearm to the exclusion of all other

firearms[.]" T.1654. In support of his argument that trial counsel unreasonably erred in failing to cross-examine Clark or retain a rebuttal expert, Petitioner submitted two affidavits from purported firearms and toolmark expert Adina Schwartz ("Schwartz"), opining that the evidence given by Clark should have been inadmissible because the field of firearms and toolmark identification is not generally accepted in the relevant scientific community. Schwartz asserted that firearms and toolmark examiners have known since at least 1935 that absolute identification claims, such as those made by Clark, are unwarranted because identification conclusions are inherently probabilistic. See, e.g., Supplemental Affidavit of Adina Schwartz ("Schwartz Supp. Aff.") ¶¶ 9 & nn. 1, 2 (SR.153-154). Schwartz criticized Clark for, inter alia, failing to take into account the possibility of subclass characteristics, which created a risk of misidentifications resulting from the examiner confusing subclass characteristics shared by toolmarks produced by more than one tool with individual characteristics produced by one tool only. Id. ¶¶ 12-13 Schwartz averred that had defense counsel consulted with, and called her as an expert witness, she would have testified, for example, that the distinction between individual and subclass characteristics is subjective and there is no defined protocol for making the distinction. Id. ¶ 31 & n. 10. Petitioner also faulted trial counsel for failing to cross-examine Clark. According to Petitioner, "[d]espite the many credible and

well-documented criticisms of toolmark identification, defense counsel failed to identify to the jury even one of the many faulty assumptions upon which toolmark identification is based, nor did defense counsel question the methodology used by the firearm examiner in this particular case."

The 440 Court denied the motion without a hearing, noting that since it was clear that trial counsel did not cross-examine the prosecutor's expert or call his own expert, Petitioner's ineffective claim was a "matter of record and no hearing [was] warranted." SR.279.[2] After reciting the federal standard for ineffective assistance claims as set forth in Strickland v. Washington, 466 U.S. 668 (1984), and the New York state standard as set forth in People v. Baldi, 54 N.Y.2d 137 (1981), the trial court found that even if Petitioner proved that trial counsel did not investigate the scientific criticisms of firearms and toolmark evidence, "such failure does not rise to the level of ineffective assistance of counsel." SR.279. The trial court opined that "considering the eyewitness testimony, the defense strategy to attack the identification and pursue lesser included offenses was reasonable[.]" SR.280 (citing People v. Lopez, 14 Misc. 3d 1223(A), 2006 WL 3960256, at *9 (N.Y. Sup. Ct. Dec. 21, 2006)).

---

[2]
Petitioner's appellate counsel indicated in his supporting affirmation that trial counsel died on or about August 15, 2010, several weeks before the filing of the C.P.L. § 440.10 motion. SR.295.

Then, on direct appeal, Petitioner again asserted that trial counsel was ineffective for declining to cross-examine the prosecution's firearms and toolmark examiner. The Appellate Division held that Petitioner "failed to establish that there was no legitimate or strategic reason for defense counsel's alleged error" in declining to cross-examine Clark. Morgan, 96 A.D.3d at 1419 (quotation and citations omitted). According to the Appellate Division, "viewing the evidence, the law and circumstances of this case in totality and as of the time of the representation," Petitioner "received meaningful representation[.]" Id. (citing Baldi, 54 N.Y.2d at 144). The New York Court of Appeals denied leave to appeal.

## 2. Analysis

Here, both state courts to have considered Petitioner's allegations of ineffective assistance ruled on the merits of the claim. That the last-reasoned decision by a state court only applied Baldi, a state law case, does not prevent a finding that the claim was "adjudicated on the merits[,]" 28 U.S.C. § 2254(d), such that this Court's review of the claim is governed by AEDPA. See, e.g., Lindstadt v. Keane, 239 F.3d 191, 198 (2d Cir. 2001). Because "the New York state standard for ineffective assistance of counsel is not contrary to [federal law]," Rosario v. Ercole, 601 F.3d 118, 126 (2d Cir. 2010), "[t]he only avenue of reprieve available to [Petitioner] . . . is to establish that the state

court unreasonably applied Strickland." Id. (citing 28 U.S.C. § 2254(d)(1)).

Strickland requires that to succeed on a claim of ineffective assistance, a petitioner must demonstrate both (1) that the performance of his counsel was objectively unreasonable, and (2) that there is a reasonable probability that, but for his counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 687-88, 694. The Supreme Court has repeatedly cautioned against "second-guess[ing] counsel's assistance after conviction or adverse sentence[,]" Strickland, 466 U.S. at 689; rather, the reviewing court must confine itself to the question of "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." Harrington v. Richter, 562 U.S. 86, 105 (2011) (quoting Strickland, 466 U.S. at 690).

Petitioner's attacks on counsel's performance ignore Strickland's instructions that when assessing whether or not counsel's performance "'fell below an objective standard of reasonableness . . . under prevailing professional norms,'" the Court must "consider the *circumstances counsel faced at the time* of the relevant conduct and . . . evaluate the conduct from counsel's point of view." Davis v. Greiner, 428 F.3d 81, 88 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 688-89) (first ellipsis in

original; emphasis supplied)).  For instance, Petitioner and his proposed expert cite United States v. Willock, 696 F. Supp.2d 536 (D. Md. 2010), and  United States v. Glynn, 578 F. Supp.2d 567 (S.D.N.Y. 2008), in which the trial court limited the testimony of ballistic and firearms experts based, in part, upon the concerns expressed in a 2008 National Academy of Sciences report, see SR.359-368, regarding the reliability of the Association of Firearm and Tool Mark Examiners ("AFTE") theory of identification used by Clark in Petitioner's case. As the 440 Court observed, "the vast majority" of the cases and articles cited by Schwartz and Petitioner post-date Petitioner's trial. SR.279. Thus, "[i]t defies logic to fault trial counsel for not knowing in 2006 that a ballistics opinion at least in one case in 2008 would be limited to being stated in terms of '"more likely than not" but nothing more[.]'" Id. (quoting United States v. Glynn, 578 F. Supp.2d 567, 575 (S.D.N.Y. 2008))[3].  Contrary to Petitioner's assertion that the concerns expressed by his proposed expert were well-established at the time of his trial, "[f]or decades . . . admission of the type of firearm identification testimony challenged by the defendants has been semi-automatic; indeed, no federal court has yet deemed it

---

[3]

In Glynn, the trial court ruled after a hearing that the expert's methodology was sufficiently reliable that he could give an opinion that it was at least "more likely than not" that the bullet and casings came from the guns in question. 578 F. Supp.2d at 568-69 (citation omitted).

inadmissible." United States v. Monteiro, 407 F. Supp.2d 351, 364 (D. Mass. 2006) (citing, inter alia, United States v. Hicks, 389 F.3d 514, 526 (5th Cir. 2004) ("We have not been pointed to a single case in this or any other circuit suggesting that the methodology [of matching of spent shell casings to the weapon that fired them] . . . is unreliable.")).

It is well established that because an counsel's performance under Strickland is measured by the state of the law at the time of the challenged conduct, "[a]n attorney is not required to "forecast changes or advances in the law." Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001) (quotation omitted). Indeed, Petitioner has not established that there in fact has been a significant or widespread change in the law regarding the admissibility of firearms identification evidence since his trial. See, e.g., United States v. Casey, 928 F. Supp.2d 397, 400 (D. P.R. 2013) ("[T]he Court declines to follow sister courts who have limited expert testimony based upon the 2008 and 2009 NAS reports and, instead, remains faithful to the long-standing tradition of allowing the unfettered testimony of qualified ballistics experts.") (citations omitted).[4]

---

[4]

In Casey, the government produced a sworn statement from chairperson of the group that produced 2008 NAS report stating that the report's purpose "was not to pass judgment on the admissibility of ballistics evidence in legal proceedings, but, rather, to assess the feasibility of creating a ballistics data base," and that "group did not actually evaluate the fundamental assumptions of firearms and toolmark identification that underlay many courts' allowance of ballistics and firearm expert testimony." 928 F. Supp.2d at 399-400. The district court observed that the

The respondent further argues that Mr. Morgan cannot be granted habeas relief on the basis of Gersten v Senkowski because that case "does not constitute clearly established Supreme Court law" and "petitioner points to no Supreme Court case holding that an attorney is ineffective for failing to present a rebuttal to expert ballistics evidence" (RB at 24; 426 F3d 588 [2d Cir 2005]). As a preliminary matter, it is entirely appropriate to rely upon cases interpreting clearly established Supreme Court precedent. Gersten expounds upon Strickland's central holding that "the Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options" (Strickland v Washington, 466 US 668, 680 [1984

**B.   Unduly Suggestive Pre-Trial Identifications**

Petitioner asserts, as he did on direct appeal, that the County court erred in refusing to suppress the eyewitness identifications by Chung and Parrish because the successive identification procedures (a photo array followed by a line-up) were unduly suggestive.

---

chairperson's statements "greatly undermine[d] the portions of the NAS report" relied upon by, e.g., Glynn and Willock. Casey, 928 F. Supp.2d at 400.

### 1.   Background

On September 29, 2005, Rochester Police Department ("RPD") Investigator Naser Zenelovic ("Inv. Zenelovic") met with Parrish at the Public Safety Building and showed him a "six-pack" photo array containing one photograph of Petitioner, located in the number three slot. Inv. Zenelovic told Parrish to take his time and to look at each photograph to see if he recognized anyone. According to Inv. Zenelovic, upon viewing the photo array, Parrish "immediately stared" at photo number three for about five to ten seconds. Parrish then stated that he "wasn't sure if he could identify anybody." H.10. Inv. Zenelovic "asked him if he recognized anybody on that piece of paper[,]" and Parrish "[p]ointed to the Photo Number 3 and said he recognized that person." Id. The investigator asked from where he recognized him, and Parrish replied, "from the North Street area." Id. Parrish became quiet and started to cry, telling Inv. Zenelovic that he was afraid of what he was doing. H.11. Inv. Zenelovic asked Parrish whether, prior to the incident, he had seen the individual who had shot into the house on Bismark Terrace. Parrish replied affirmatively, explaining that he knew the person from the North Street Recreation Center and from around the neighborhood, and that this individual's nickname was "Poo." Id. Inv. Zenelovic asked Parrish if the man who shot into the house on Bismark Terrace was in any of the photographs, and Parrish replied affirmatively, pointing to photo

-15-

number three. Id. At that point, Inv. Zenelovic informed Parrish that the man depicted in photo number three was Petitioner.

Meanwhile, RPD Investigator John Penkitis ("Inv. Penkitis") met with Chung at her home and showed her a six-pack photo array. After viewing the photos for a "little bit," Chung pointed to numbers three and four and said that the shooter looked like either one of the two men depicted in those photos (Petitioner's photograph was number four). Inv. Penkitis thanked Chung for her time and asked her if she remembered anything else about what happened the night before.

Later that day, Parrish and Chung participated, separately, in viewing a line-up identification procedure coordinated by RPD Investigator Gary Galetta ("Inv. Galetta"). Prior to the line-up, Chung and Parrish did not speak with each other or any other witnesses present. Inv. Galetta read them instructions from a pre-printed form, and asked if they could identify anyone from the line-up. One at a time, the witnesses viewed the line-up, which consisted of six black males with similar appearance and descriptions, each dressed in an orange jumpsuit. Each of the subjects held a card with a number on it; Petitioner held card number two. Each of the line-up subjects was asked to step forward individually, face the glass, make quarter turns until a full rotation was completed, and then step back into his position in the line-up.

Parrish viewed the line-up at approximately 10:18 p.m. After each of the subjects came forward and turned around, Inv. Galetta asked Parrish if he wanted to see anyone again, and Parrish declined. Parrish indicated that he recognized subject number two. When asked how he recognized number two, Parrish replied that he recognized the subject "[f]rom the shootings." SR.691. Chung viewed the line-up at 10:35 p.m., and the same procedures were applied. Chung asked to see number two once more. After doing so, Chung stated, "I think I had seen him when [Hazzard] got shot." SR.692.

In a written decision dated March 21, 2006, SR.688-693, the Monroe County Court (Marks, J.) ("the Suppression Court") found that each identification procedure was "conducted in a manner consistent with [Petitioner's] rights." SR.693. The Suppression Court found no evidence of undue suggestiveness in the photo arrays or the line-ups, and held that is was not suggestive for the police to have had the witnesses view Petitioner in a corporeal line-up after having selected him in a photo array. Id.

On direct appeal, the Appellate Division held that "[e]ven assuming, arguendo, that [Petitioner]'s contention is preserved for our review, . . . it is without merit." Morgan, 96 A.D.3d at 1419 (citations omitted). Commenting that it was "well settled" that multiple pretrial identification procedures are "not inherently suggestive[,]" id. (quotation and citations omitted), the Appellate Division found that "[t]here was nothing unduly suggestive about

-17-

having [the first witness in question] view defendant in a lineup after [he] had already selected [defendant's] photograph from an array[.]" Id. (quotation and citation omitted; brackets in original). With respect to the second witness in question, i.e., Chung, the Appellate Division "conclude[d] that showing the witness a photo array followed by a lineup was not unduly suggestive under the circumstances of this case[.]" Id. (citations omitted).

Because Petitioner's suggestive identification claim was adjudicated on the merits by the state court, he can obtain relief only if that ruling was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

### 2. Analysis

Although the Supreme Court has recognized that "[m]ost eyewitness identifications involve some element of suggestion[,]" Perry v. New Hampshire, 132 S. Ct. 716, 727 (2012), it nevertheless has declined to impose a rule of automatic exclusion for identifications tainted by improper police influence. Id. at 720. In Simmons v. United States, 390 U.S. 377, 384 (1968), the Supreme Court addressed the issue of whether, and under what circumstances, the showing of a photographic array to an eyewitness taints that eyewitness' identification of a suspect during a subsequent identification procedure. The Supreme Court held that "[i]f there is 'a very substantial likelihood of irreparable misidentification,'" Perry, 132 S. Ct. at 720 (quoting Simmons, 390

U.S. at 384), "the judge must disallow presentation of the [identification] evidence at trial." 132 S. Ct. at 720. However, "if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." Id.

Petitioner asserts that he is not arguing that "successive identification procedures are ipso facto impermissible." Reply (Dkt #7) at 7. Rather, Petitioner argues, "it is improper to engage in successive identification procedures when the participant is unsure of his/her selection and the police have suggested the suspect's identity." Id. (citing Foster v. California, 394 U.S. 440, 442-43 (1969)).

In Foster, during the first lineup, there were only three subjects, and the petitioner "stood out from the other two men by the contrast of his height and by the fact that he was wearing a leather jacket similar to that worn by the robber." 394 U.S. at 442 (citation omitted). When this lineup "did not lead to positive identification," the police permitted an extended "one-to-one confrontation" between the petitioner and victim, which still yielded only a "tentative" identification. Id. at 443. Then, a third lineup was arranged in which the petitioner "was the only person in this lineup who had also participated in the first lineup." Id. (citation omitted). After this second lineup, the

victim made a "definite identification." Id. The Supreme Court described the facts in Foster as presenting "a compelling example of unfair lineup procedures." 394 U.S. at 442.

Here, the first identification procedure consisted of the witness viewing a "six-pack" photo array with five "fillers" and one photo of Petitioner. In contrast to Foster, there is no contention that Petitioner's photo "stood out" from the fillers in any way. Furthermore, the police did not conduct "one-to-one" confrontations between the eyewitnesses and Petitioner.

Although Parrish initially said that he "wasn't sure" if he could identify anyone, he made a definite identification during the same procedure, selecting Petitioner's photograph as depicting a person he knew as "Poo" from the North Street area; he also told Inv. Zenelovic that this was the person who shot into the house at 28 Bismark Terrace. Chung's identification of Petitioner during the first procedure (the photo array) admittedly was tentative. However, rather than showing her additional photo arrays, and increasing the likelihood that an identification would result from the recognition of Petitioner's photograph, the police conducted a corporeal line-up, the preferred procedure. See, e.g., United States ex rel. Kubat v. Thieret, 679 F. Supp. 788, 801 (N.D. Ill. 1988) (to avoid possibility of mistaken identification due to repeated showing of photographs in which single individual recurs, physical line-up is "preferable procedure") (citation omitted).

Petitioner has made no accusation that the line-up procedure itself was unduly suggestive, e.g., that the subjects were physically dissimilar from himself (as was the case in Foster).

When analyzing Foster, "courts have repeatedly emphasized the layers of impropriety . . . underlying the decision-from the physical discrepancies of the suspects, the identifying clothing, and particularly the extended one-on-one showup." Bear v. Halford, No. C 96-2122 MJM, 2001 WL 34152086, at *10 (N.D. Iowa June 14, 2001) (citing, inter alia, United States v. Donaldson, 978 F.2d 381, 386-87 (7th Cir. 1992) (direct appeal; holding that repetition of defendant's picture in multiple identification procedures does not in itself trigger Foster exclusion)). Here, however, Petitioner has not established that the successive identification procedures were analogous to those present in Foster, which were found to have "so undermined the reliability of the eyewitness identification as to violate due process[,]" 394 U.S. at 443. On the present record, the state courts did not apply Supreme Court precedent in an objectively unreasonable manner when they rejected Petitioner's due process challenge to the fairness of the identification procedures. There accordingly is no need to address whether Chung's and Parrish's pretrial identification of Petitioner was independently reliable despite the effect of any suggestiveness. See, e.g., Jarrett v. Headley, 802 F.3d 34, 42 (2d Cir. 1986) ("[I]f the procedures were not impermissibly suggestive, . . . the reliability

-21-

of the identification is simply a question for the jury[.]")
(internal and other citations omitted).

Petitioner argues that, as in Foster, the successive
identification procedures "made it all but inevitable," Foster, 394
U.S. at 443, that the witnesses would identify Petitioner, whether
or not he in fact was the perpetrator. With regard to Parrish,
Petitioner asserts that the first procedure in which Parrish
participated (the photo array) was suggestive because, after
Parrish initially did not select anyone, Inv. Zenelovic "told him
to make a selection after the officer speculated that . . . Parrish
was 'staring'" at Petitioner's photograph. Reply at 7. Petitioner
has no basis for characterizing as mere speculation the
observations by Inv. Zenelovic of Parrish, who was sitting right in
front of him during the viewing of the photo array. Furthermore, by
characterizing Inv. Zenelovic's observations as "speculation",
Petitioner is demanding that this Court to overrule the credibility
assessment made by the suppression court, which had the opportunity
to hear Inv. Zenelovic's testimony and observe his demeanor. This
is impermissible. Finally, despite Petitioner's contrary assertion,
Parrish did not incorrectly identify Petitioner or identify him by
the wrong name. Instead, Parrish stated that he knew Petitioner by
his nickname ("Poo") and that he recognized "Poo" from the
neighborhood recreational facility. It was not until after Parrish

positively identified Petitioner as the shooter on Bismark Terrace that Inv. Zenelovic informed him of Petitioner's given name.

With regard to Chung's identification, contrary to Petitioner's contention, <u>Foster</u> is easily distinguishable from his case. As an initial matter, Petitioner has mischaracterized Inv. Zenelovic's testimony  here asserts that what that is precisely what happened here. Mr. Parrish initially could not select anyone and the officer told him to make a selection after the officer speculated that Mr. Parrish was "staring" at Mr. Morgan's photo on a piece of paper the Supreme Court concluded that a photo array will taint a subsequent identification procedure and cause it to be set aside only if the photographic procedure used was so impermissibly suggestive as to give rise to a likelihood of misidentification. No such facts are alleged in this case.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    Rochester, New York
          June 16, 2015

-23-